# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 14, 2011

No. 10-70004

Lyle W. Cayce
Clerk

CARLOS TREVINO,

Petitioner

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:01-CV-306

Before DAVIS, SMITH, and DENNIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge.[*]

Petitioner Carlos Trevino was convicted of capital murder in Texas state court and sentenced to death. The district court denied each of Trevino's eight claims for habeas relief, but granted a certificate of appealability ("COA") pursuant to 28 U.S.C. § 2253(c) on three of these issues. Trevino now petitions this court to issue COAs authorizing appeal from the district court's denial of habeas corpus relief regarding the five issues on which the district court denied

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-70004

COA. Because reasonable jurists would not find it debatable that the district court correctly rejected these five claims, we DENY Trevino's petition for COA regarding these issues. We further address the three issues on which the district court did grant COA. Finding these claims without merit, we AFFIRM the district court's denial of relief on these grounds.

I.

A.

We summarize the key facts and procedural background recited at length by the district court. *United States v. Trevino*, 678 F. Supp. 2d 445, 449-55 (W.D. Tex. 2009). The body of 15-year old Linda Salinas was discovered in Espada Park in San Antonio Texas on June 10, 1996. The San Antonio Police Department began an investigation into Salinas's death. Following the investigation, on April 8, 1997, a Bexar County, Texas grand jury indicted Trevino on a charge of capital murder for intentionally and knowingly causing the death of Linda Salinas by cutting and stabbing her with a deadly weapon while in the course of committing and attempting to commit the aggravated sexual assault of Salinas. Trevino rejected the state's subsequent plea offer and chose to go to trial.

Testimony at Trevino's trial established that on the evening of June 9, 1996, he accompanied Santos Cervantes, Bryan Apolinar, Seanido "Sam" Rey, and Juan Gonzales (Trevino's cousin), on a trip in Apolinar's car to a store to buy beer for a party they had been attending. Cervantes enticed 15-year old Linda Salinas to get into Apolinar's car with the assurance Apolinar would take Salinas to a nearby fast-food restaurant.

Instead of driving to the restaurant, Apolinar drove the group to Espada Park, where Cervantes, Apolinar, and Rey sexually assaulted Salinas while she unsuccessfully struggled to escape. Gonzales testified as the prosecution's key witness regarding the following: (1) Gonzales saw Trevino hold Salinas down

while Rey raped her; (2) at one point, Trevino urged Gonzales to rape Salinas, but Gonzales refused; (3) Gonzales overheard Apolinar, Cervantes, and Trevino discuss their mutual desire not to leave any witnesses behind; (4) Gonzales heard Rey say "we don't need no witnesses" and heard Cervantes repeat the same comment, then heard Trevino reply "we'll do what we have to do"; (5) at that point, Gonzales returned to the group's vehicle; (5) when the others returned, Gonzales noticed that Cervantes and Trevino had blood on their shirts.

Gonzales further testified that following the incident, during the group's ensuing drive away from the scene, Cervantes made a comment that it was "neat" or "cool" about how Trevino had "snapped" Salinas's neck, and also made a comment about a knife. Trevino responded with the comments "I learned how to kill in prison" and "I learned how to use a knife in prison." Gonzales also testified that, after the incident, Trevino told Gonzales not to say anything to the police. Further, Gonzales testified that when he asked Cervantes why he killed the girl, Cervantes responded "mind your own business." Gonzales additionally testified that while he never saw Trevino or anyone else with a knife at the scene of the murder, Gonzales had seen Cervantes with a knife a few days before Salinas's murder and, two days after the murder, Cervantes told Gonzales he had broken the knife and thrown it into a river.

Salinas's body was discovered in Espada Park the day after the murder. According to expert testimony at Trevino's trial, an autopsy revealed (1) Salinas suffered two stab wounds to the left side of her neck, one of which was fatal; (2) Salinas sustained soft tissue damage in her vaginal area and at her anal opening; (3) Salinas sustained no internal injuries to her neck other than those caused by the two stab wounds, and there was no physical evidence anyone had attempted to "snap" her neck; and (4) there were scratches on Salinas's legs and fresh bruises on her breasts.

No. 10-70004

Other evidence during the guilt/innocence phase of Trevino's trial included testimony from forensic and DNA experts establishing (1) the examination of a pair of blue women's shorts and a pair of white women's panties found at the crime scene, both identified by Linda Salinas's mother as belonging to Linda, revealed the presence of polyester and cotton fibers which were consistent with a pair of slacks owned by Trevino; and (2) a blood stain found on Linda Salinas's white panties contained a mixture of the DNA from at least two persons, with DNA testing eliminating as possible sources of the DNA all but Salinas and Trevino from among those identified by Gonzales as present at the scene.[1]

The jury returned a guilty verdict. During the punishment phase of trial, the prosecution presented evidence regarding Trevino's culpability and future dangerousness, including his former arrests and his admitted membership in a violent street gang. As mitigating evidence, the defense presented Trevino's aunt, who testified generally that she knew Trevino to be a good person and that he had experienced certain difficulties in his life, including the absence of his father and his mother's alcohol problems.

The jury returned its verdict at the punishment phase of trial, finding (1) that Trevino would commit criminal acts of violence in the future which would constitute a continuing threat to society; (2) Trevino actually caused the death of Linda Salinas or, if he did not actually cause her death, he intended to kill her or another, or he anticipated a human life would be taken; and (3) there were insufficient mitigating circumstances to warrant a sentence of life imprisonment. In accordance with the jury's verdict, the state trial court imposed a sentence of death.

---

[1] The state's expert testified that 1 of every 2,684 members of the southwestern United States Hispanic population has the same DNA profile identified on the panties and that the DNA evidence did no more than rule out as possible sources of the blood the other individuals present at the scene except for Trevino and Salinas.

No. 10-70004

Trevino directly appealed his conviction and sentence, asserting 19 claims for relief. The Texas Court of Criminal Appeals affirmed his conviction and sentence. *Trevino v. State*, 991 S.W.2d 849 (Tex. Crim. App. 1999). While his direct appeal was still pending, Trevino filed an application for state habeas corpus relief in which he urged 46 grounds for relief. The state habeas trial court held an evidentiary hearing during which Trevino's former trial counsel testified in part that (1) the defense contacted Gonzales prior to trial and knew what testimony he would give; (2) Trevino never denied participating in the offense and admitted he was present when Salinas was killed; (3) when defense counsel pressed Trevino about the facts of the offense, Trevino responded he was too stoned at the time of the offense to recall details; and (4) Trevino never denied saying "I learned to kill in prison." The state habeas trial court denied the habeas corpus application. The Texas Court of Criminal Appeals adopted the state habeas trial court's findings and conclusions and denied Trevino's state habeas corpus application. *Ex parte Carlos Trevino*, WR-48,153-01 (Tex. Crim. App. April 4, 2001).

On March 14, 2002, Trevino filed his original petition for federal habeas corpus relief in the district court, asserting four claims for relief. He subsequently filed, and the district court granted, an unopposed motion for stay, seeking leave to return to state court and explore a potential mental retardation claim, as well as other unexhausted claims.

Trevino then filed his second state habeas corpus application, asserting new claims that (1) his trial counsel rendered ineffective assistance by failing to adequately investigate, develop, and present available mitigating evidence during the punishment phase of trial; and (2) the Supreme Court's holding in *Atkins v. Virginia,* 536 U.S. 304, 122 S. Ct. 2242 (2002) precludes his execution because he suffers from fetal alcohol syndrome. The Texas Court of Criminal Appeals dismissed  Trevino's second state habeas corpus application pursuant

5

No. 10-70004

to the Texas writ-abuse statute in an unpublished, per curiam order. *Ex parte Carlos Trevino*, WR-48,153-02, 2005 WL 3119064 (Tex. Crim. App. November 23, 2005).

Thereafter, Trevino filed, and the district court granted, another motion for stay in which Trevino sought to return to state court and exhaust a new claim based on his federal habeas counsel's discovery in the state's files of a written witness statement dated June 12, 1996 given by Rey indicating that Cervantes, not Trevino, stabbed the victim.

Trevino then filed a motion for appointment of counsel in state court, seeking legal representation in connection with this new claim. However, for over two years the state judicial officers either failed or refused to appoint counsel for Trevino to pursue this claim, despite entreaties from the district court. The district court then lifted the stay and federal proceedings resumed.

B.

On December 8, 2008, Trevino filed his amended petition for federal habeas corpus relief, in which he asserted eight claims for relief. The district court denied relief on all claims, but granted COA on three of these claims. Trevino now appeals the district court's rejection of those three claims. Trevino also seeks COAs to authorize appeal of the claims on which the district court denied COA.

Trevino's primary assertion in the current appeal is that prosecutors failed to disclose Rey's June 12, 1996 written statement which suggested that Santos Cervantes stabbed Salinas and that this nondisclosure violated Trevino's constitutional rights pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963).

The record evidence indicates that this June 12, 1996 statement was the second of three signed, written statements Rey gave to police on June 12 and 13, 1996 during the investigation of Salinas's death. A report created by Detective

No. 10-70004

Charles Gresham summarized all of the witness statements made during the investigation, including Rey's three statements.

In his first statement made on June 12, 1996, Rey essentially denied any involvement in the crime. Gresham's report accurately summarizes this first statement. When Gresham confronted Rey with contradictory testimony from witnesses, Rey made a second statement the same day. In the pertinent part of this second statement, Rey stated that he and his friends drove with the victim from the store to Espada Park where Santos Cervantes took the victim into the woods by himself and then returned alone about 15 minutes later. According to Gresham's summary, when Rey asked Santos Cervantes where the girl was, "Santos told him he killed her." The full written statement is lengthier and includes more detail. This second statement forms the basis for Trevino's *Brady* claim on this petition.

On June 13, 1996, Gresham obtained arrest warrants for Rey and Trevino. After being taken into custody, Rey made a <u>third</u> signed, written statement to the police on June 13. This third statement reads in pertinent part as follows:

> This is the third statement I have given to the police. Everything I have said in my second statement about how the girl Linda ended up in the car is true. . . . We got to the park. Santos [Cervantes] and the girl got out of the car and went down the hill. I stayed on the top of the hill where we parked the car. Me, Bryan [Apolinar], Thate [Gonzales], and Carlos [Trevino] stayed with the car for about five minutes. All of use went down to where Santos [Cervantes] was. When I got to where Santos [Cervantes] and Linda were Linda had he[r] pants down to her ankles and her shirt was up. I could see her breasts she did not have her bra on . . . . Santos [Cervantes] was having sex with Linda . . . . After Santos [Cervantes] finished, I think Carlos [Trevino] had sex with her. <u>Carlos [Trevino] had sex with her about ten seconds</u>. I had sex with Linda next. I only went about ten seconds. After me Thate [Gonzales] had sex with Linda. He went about ten seconds. Bryan [Apolinar] had sex with Linda next he went about a minute. Santos [Cervantes] had sex with Linda again. Carlos [Trevino] and Bryan [Apolinar] at the same

7

No. 10-70004

time told me and Thate [Gonzales] to go up and look out. Santos [Cervantes] was still having sex with Linda. Up to this point I did not see anyone hit Linda. No one yelled at her that I know of. Thate [Gonzales] and me went back up the hill to the car. Thate [Gonzales] and me got in the car. We both got in the back. <u>They were down there about five minutes, Santos [Cervantes], Bryan [Apolinar] and Carlos [Trevino]. Thate [Gonzales] and me were wondering what was taking so long. All three of them came up the hill. I asked what happened Carlos [Trevino] said they killed her that they cut her throat. Santos [Cervantes] said they cut her throat, we killed her[.] I asked how they said we cut her throat. Carlos [Trevino] said don't tell anybody. Carlos [Trevino] started to brush his shoes off with his hand, I saw they had blood on them.</u>

(underlined emphasis added). Gresham's report included an accurate summary of Rey's third statement. The summary contained the following description of the most relevant part of Rey's third statement:

Seanido [Rey] stated Santos [Cervantes], Bryan [Apolinar], and Carlos [Trevino] then returned to the car and when he asked Carlos [Trevino] what had happened he was told they had cut her throat. He reported he observed Carlos [Trevino] brushing his shoes off with his hand and he could see there was blood on them.[2]

---

[2] According to Gresham's report, Rey's third statement was largely consistent with Apolinar and Cervantes' statements. Gresham summarized Apolinar's statement as follows:

Bryan [Apolinar] reported Carlos [Trevino] started jerking on her and he could tell he was trying to break her neck. Bryan [Apolinar] stated at this time he couldn't handle it any more and he walked back to the car. He stated about a minute later they all come back up the slope except Linda [Salinas] and he could see Carlos [Trevino] had blood all over him that he was wiping off with a shirt. Bryan [Apolinar] stated he could also see Carlos [Trevino] had a knife that he was also wiping off and that no one else had blood on them.

Apolinar was convicted of sexually assaulting Salinas. In upholding Apolinar's conviction, the Texas Court of Appeals took note of Apolinar's statement that he witnessed Trevino "stab the victim." *Apolinar v. Texas*, No. 04-99-00644-CR, 2000 WL 1210922, *1 (Tex. Ct. App. Aug. 16, 2000) (unpublished).

Cervantes pleaded guilty to Salinas's murder. Gresham's summary of Cervantes's statement contains a similar description of the crime:

No. 10-70004

Following the trial of this case, Rey pleaded guilty to murder and is currently serving a 50-year sentence. In connection with his guilty plea, Rey stipulated to the facts contained in Gresham's police report and his witness statements, all three of which were attached to his stipulation. *See State v. Rey*, No. 97-CR-1717C (290th Dist. Ct., Bexar County, Tex. Mar. 25, 1998) (factual stipulations and attached exhibits).[3]

At some point during the instant action, Trevino's federal habeas counsel discovered Rey's <u>second</u> June 12, 1996 written statement. The full, signed statement had been kept in one of the state's separate files and, thus, had not been previously turned over to Trevino's lawyers. Nevertheless, the original prosecutors in Trevino's case have provided affidavits in connection with this action asserting that they provided Trevino's trial counsel with a copy of

---

He reported he then see Carlos [Trevino] grab up Linda and he had her by the neck with both arms and was pushing with them. Santos [Cervantes] stated Carlos [Trevino] put her down and Sam [Rey] put his foot on her neck and told her 'don't move bitch.' Santos [Cervantes] stated he could hear gurgling noises coming from Linda while this was going on. He stated he then saw Sam [Rey] move his foot and Carlos [Trevino] grabbed Linda [Salinas] up by the hair and stabs her twice.

[3] This appeal has been complicated by the fact that Trevino's counsel placed Rey's second written statement into the record, but Rey's third written statement inexplicably does not appear in the record on appeal. The district court, therefore, did not have the benefit of reviewing Rey's third written statement. Nevertheless, all three of Rey's signed, written statements appear in the record of Rey's murder case in Bexar County district court. The existence and the content of these statements are beyond dispute and, moreover, our review of Trevino's *Brady* claim is *de novo*. Therefore, we take judicial notice of Rey's third written statement. *See Brown v. Lippard*, 350 F. App'x 879, 883 n.2 (5th Cir. 2009) (taking judicial notice of state courts records outside the record on appeal). This is consistent with our routine practice in *habeas* appeals of taking judicial notice of all related proceedings brought by the appellant, including state proceedings, "even when the prior state case is not made a part of the record on appeal." *See Moore v. Estelle*, 526 F.2d 690, 694 (5th Cir. 1976). If we failed to take judicial notice of Rey's third written statement, the court's understanding of the record evidence would be incomplete. *See id.* ("For a proper understanding of protracted litigation we may draw upon the records of all the preceding cases."). Because Trevino has not had an opportunity to have input into our decision to take judicial notice of documents in the state court proceedings involving Rey, we afford him the right to raise any objection he may have by means of a petition for rehearing, which objection we will consider filed before our opinion issued.

No. 10-70004

Gresham's entire report before trial, including Gresham's summary of Rey's three statements. Trevino's two trial attorneys, Gus Wilcox and Mario Trevino, have provided counter-affidavits stating that they do not recall ever seeing Gresham's summaries of Rey's statements.

However, the record of Trevino's first state habeas proceeding is inconsistent with the affidavits of Trevino's attorneys. During that proceeding, Wilcox and Mario Trevino both gave testimony strongly suggesting that they had evaluated the witness statements in Gresham's report. Mario Trevino testified that he had been given access to statements of the prosecution's potential witnesses, as well as various police reports, and that he was aware of at least "two guys that gave statements that were pointing the finger to Mr. Trevino." Wilcox went further and testified that because he knew that *all* of the state's potential witnesses would inculpate Trevino, Wilcox had adopted a trial strategy of not calling any witnesses while instead relying on cross-examination in an attempt to create a reasonable doubt. The potential witness list that prosecutors provided to Trevino's attorneys prior to trial included Rey.[4]

---

[4] The following exchange with Wilcox took place at the state habeas proceeding:

Q. [W]hat theory of or what defensive posture did you decide to take in front of the jury at guilt/innocence?
A. Well, I think what we were hoping to be able to somehow to do, is somehow show that he was merely present and did nothing to commit the crime.
Q. In order to do it through a witness, you would have had to call one of the State's potential witnesses, right?
A. Well, right. That's part of the problem. So, I mean, I was going to - - We would try and develop that through cross-examination at best, really. That's what we were going to have to do.
Q. Because, correct me if I'm wrong, but if you would have called any of those witnesses, they would have put your client at the scene, right?
A. That's right.
Q. And hence corroborated the witnesses called by the State; correct?
A. Well, yeah.
Q. So you made a strategic decision to try to present a case of reasonable doubt through the cross examination of the State's witnesses?
A. That's basically it.

10

No. 10-70004

On this petition, Trevino relies on Rey's second written statement to argue that if that statement had been disclosed, the defense could have shown that Cervantes, rather than Trevino, killed the victim. Trevino asserts that the alleged nondisclosure of the entire written statement had a prejudicial effect at both the guilt and sentencing stages of his trial in violation of his rights under *Brady*.

Trevino has also raised various other claims, including a claim that his trial counsel failed to effectively investigate and present available mitigating information during the sentencing phase of Trevino's trial. As discussed further below on a claim-by-claim basis, the district court rejected each of Trevino's claims for relief.

II.

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "[b]efore an appeal may be entertained, a prisoner who was denied habeas relief in the district court must first seek and obtain a COA . . . ." *Miller-El v. Cockrell*, 537 U.S. 322, 335, 123 S. Ct. 1029, 1039 (2003); 28 U.S.C. § 2253(c)(1). Trevino is entitled to a COA only if he can make "a substantial showing of the denial of a constitutional right." *Miller-El*, 537 U.S. at 336, 123 S. Ct. at 1039 (citing § 2253(c)(2)). To meet this standard, Trevino must demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that issues presented were adequate to deserve encouragement proceed further." *Id.* (internal quotations and citations omitted); *accord Tennard v. Dretke*, 542 U.S. 274, 288, 124 S. Ct. 2562, 2572 (2004).

No. 10-70004

In making a COA inquiry, we must consider that AEDPA required the district court to defer to the state court's resolution of Trevino's claims, except in limited circumstances. *Foster v. Quarterman*, 466 F.3d 359, 365 (5th Cir. 2006). Under AEDPA, federal courts may not grant habeas relief with respect to a claim adjudicated on the merits in state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(1)-(2); *see also Penry v. Johnson*, 532 U.S. 782, 792, 121 S. Ct. 1910, 1918 (2001). We "must presume that the state court's factual findings are correct unless [Trevino] meets his burden of rebutting that presumption by clear and convincing evidence." *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009) (citing 28 U.S.C. § 2254 (e)(1)).

"[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief." *Orman v. Cain*, 228 F.3d 616, 619-20 (5th Cir. 2000); 28 U.S.C. § 2254(b)(1). Special circumstances permitting federal courts to review a claim before it has been exhausted in state court include (1) when there is an absence of available state corrective process; or (2) when circumstances exist that render such process ineffective to protect the federal habeas petitioner's rights. 28 U.S.C. § 2254(b)(1)(B)(i)-(ii).

In reviewing an issue on which the district court granted COA, "we review the district court's findings of fact for clear error and its conclusions of law *de novo*, applying the same standards to the state court's decision as did the district court." *Busby v. Dretke*, 359 F.3d 708, 713 (5th Cir. 2004).

III.

12

No. 10-70004

We first address the five issues on which the district court denied COA.

A.

Trevino first argues that the state violated his constitutional rights under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) by failing to disclose Rey's second written statement dated June 12, 1996. He contends that had the state properly disclosed this statement, he likely could have established reasonable doubt regarding his guilt.

Because the state courts never effectively addressed the merits of this issue or dismissed it as procedurally defaulted, the district court reviewed this claim *de novo* pursuant to 28 U.S.C. § 2254(b)(1).[5] The district court determined that unresolved questions of fact exist as to whether the government suppressed or properly disclosed Rey's statement, but concluded that the statement did not meet *Brady's* materiality requirement with regard to the guilt/innocence phase of the trial. On our own *de novo* review, we agree with the district court regarding the statement's lack of materiality.

There are three basic elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it may be used as impeachment evidence; (2) the evidence must have been suppressed by the state; and (3) the evidence must be "material." *Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272 (2004). Evidence is "material," i.e., prejudicial, when there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Banks,* 540 U.S. at 698-

---

[5] The district court explained that when Trevino's federal habeas counsel discovered Rey's statements, the district court stayed its proceedings to allow Trevino to pursue the *Brady* claim in state court. The state authorities, however, failed or refused to appoint counsel for Trevino, despite explicit entreaties from the district court. The district court held that the state's failure or refusal to appoint counsel rendered the state process "ineffective" to protect Trevino's constitutional rights, pursuant to 28 U.S.C. § 2254(b)(1), thus permitting the district court to review the claim without it having first been adjudicated in state court. *See Trevino*, 678 F. Supp. 2d at 458. We agree that, under the circumstances, the district court was authorized under 28 U.S.C. § 2254(b)(1) to review the claim *de novo*.

No. 10-70004

99, 124 S. Ct. 1276; *see also Miller v. Dretke*, 404 F.3d 908, 913-16 (5th Cir. 2005).

1.

As an initial matter, although the district court did not resolve the factual issues surrounding whether the state suppressed Rey's second written statement, the record evidence strongly indicates that the prosecution did not suppress the statement.[6] Given the evidence discussed above indicating that the prosecution disclosed Gresham's accurate summary of Rey's three statements to Trevino's attorneys prior to trial, this should have put defense counsel on notice that Rey had made one statement to police suggesting that Cervantes stabbed the victim. The onus was then on Trevino's lawyers to request a copy of the full statement. *See generally Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997) (failure to discover material evidence must not be the result of the lack of due diligence). Regardless, even assuming that the state failed to properly disclose Rey's second written statement, this statement does not meet the requisite standard of materiality for the following reasons.

2.

In light of Rey's third written statement to the police inculpating Trevino in Salinas's murder, it is indisputable that Rey's second written statement was immaterial to Trevino's case. If Trevino's lawyers had been successful in introducing Rey's second statement[7] to suggest that Cervantes was solely

---

[6] The state argued that Rey's written statement was available to the defense under the state's "open-file" policy. The district court held that it need not resolve the factual issues regarding whether the state had suppressed the statement given the district court's conclusion that the statement was not material.

[7] Rey's second written statement would likely have been inadmissible hearsay. *See* FED. R. EVID. 801(c); TEX. R. EVID. 801(d). In this circuit, inadmissible evidence may be material under *Brady* if it somehow leads to other exculpatory evidence; the key is still "whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different." *Felder v. Johnson*, 180 F.3d 206, 212 (5th

No. 10-70004

responsible for Salinas's murder, the prosecution undoubtedly would have introduced Rey's third statement.[8] Introduction of Rey's third statement would have destroyed any benefit Trevino would have otherwise gained from the second statement.   Not only does Rey's third statement expressly retract his second statement's assertion that Cervantes took Salinas to the woods by himself, Rey's third statement plainly describes Trevino's active participation in Salinas's rape and murder.   Rey's third statement contains the following testimony: (1) Trevino raped Salinas; (2) Trevino, Cervantes, and Apolinar were present when Salinas was killed; (3) when Trevino, Cervantes, and Apolinar returned to the car without Salinas, Rey "asked what happened [and] Carlos [Trevino] said they killed her that they cut her throat"; (4) Trevino had blood on his shoes; and (5) Trevino said "don't tell anybody."

In the extremely unlikely event that Rey had attempted to testify at Trevino's trial to the facts contained in his second statement, the prosecution would have undoubtedly impeached Rey with his third statement to the police. Accordingly, it is very clear that even if Trevino's counsel had been permitted to use Rey's second written statement at trial, this would have failed to benefit Trevino.  To the contrary, admission of Rey's written statements would have been extremely damaging to Trevino's interests.

Under these circumstances, Rey's second written statement cannot be considered material because there is not a "reasonable probability" that the outcome of Trevino's trial would have been different if the full statement had

---

Cir. 1999).

[8] *See, e.g.,* FED. R. EVID. 806 ("When a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness . . . ."); *accord* TEX. R. EVID. 806

15

been disclosed. In fact, quite the opposite is true—it is almost certain that the outcome would have been the same.

3.

Additionally, we note our agreement with the district court that the evidence presented at Trevino's trial supports the jury's verdict of conviction under Texas's law of the parties.[9] As explained, Rey's written statements cast no doubt on the substantial, uncontroverted evidence presented during the guilt/innocence phase of the trial supporting the conclusion that Trevino acted with intent to commit the offense and aided or attempted to aid other members of the group in commission of Salinas's murder. Rey's third written statement is consistent with the trial evidence. There is no reasonable probability that but for the alleged failure of the prosecution to disclose Rey's second written statement, the jury would have found Trevino not guilty of capital murder under Texas's law of the parties.

Jurists of reason cannot find the district court's denial of Trevino's *Brady* claim on these grounds debatable. *See Miller*, 404 F.3d at 916 (denying COA in capital murder case regarding suppression of evidence that defendant had not shot the victim because "uncontroverted, overwhelming evidence" showed that defendant participated in the crime and was, thus, guilty under Texas's law of

---

[9] Such law, according to the instruction given to the jury, provides, *inter alia,* the following:

> [A] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is criminally responsible, or both. Each party to an offense may be charged with commission of the offense. . . A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense.

*See Trevino,* 678 F. Supp. 2d 445 (quoting and explaining the instructions given to the jury regarding Texas's law of parties); *see also* TEX. PENAL CODE § 7.02 (2011).

16

No. 10-70004

the parties).  We, therefore, affirm the district court's denial of a COA on this issue.

## B.

We next turn to Trevino's request for COA regarding the district court's denial of  his claim for ineffective assistance of counsel during the guilt/innocence phase of trial based on his counsel's failure to discover Rey's second written statement.  It is clear that this argument fails for the same reasons described above.

To prove ineffective assistance of counsel, Trevino must generally show (1) that his counsel's performance was deficient; and (2) that this deficiency prejudiced the defendant.  *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2059 (1984).  Trevino cannot show prejudice based on his counsel's failure to uncover Rey's second written statement for the same reasons that he cannot show that the statement was material under *Brady*.  The record evidence suggests, moreover, that because Trevino's attorneys had access to Gresham's accurate summaries of all three of Rey's witness statements, they appreciated the import of Rey's third statement.  The record demonstrates that Trevino's attorneys reasonably believed all of the state's potential witnesses—including Rey—would inculpate Trevino if called to testify.  This is why Trevino's attorneys did not attempt to call Rey or any other witnesses.  Nothing in the record remotely suggests that disclosure of the full text of Rey's  second written statement would have changed this strategic calculation made by Trevino's attorneys, particularly in light of Rey's third statement. Jurists of reason cannot debate the district court's conclusion on this issue.  Therefore, we affirm the district court's denial of a COA regarding this issue.

## C.

No. 10-70004

We next consider Trevino's argument that a COA should issue regarding the district court's rejection of Trevino's claim that his trial counsel failed to investigate and develop mitigating evidence during the sentencing phase of trial. The district court held that this claim was procedurally defaulted because Trevino failed to raise it during his first state habeas proceeding, which resulted in dismissal by the Texas Court of Criminal Appeals on the basis of Texas's "abuse of the writ" doctrine when Trevino presented the issue in his second state habeas suit. *See* TEXAS CODE OF CRIM. P. ANN. ART. 11.071 § 5(c) (2011).

A claim is procedurally defaulted when a state court clearly and expressly bases its dismissal of a claim on a state procedural rule and that rule provides an independent and adequate ground for dismissal. *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 2253-54 (1991). When such a dismissal based on independent and adequate state law grounds has occurred, we do not reach the merits of the federal habeas claim. *Id.*

The district court rightly observed that we have expressly held "Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review." *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2005); *accord Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008). Moreover, we recently addressed a "perfunctory" dismissal order by the Texas Court of Criminal Appeals—similar to the order dismissing Trevino's second state habeas petition—that cited Article 11.071, Section 5 of the Texas Code of Criminal Procedure in dismissing a claim for ineffective assistance of counsel, without further explanation. *Balentine v. Thaler*, 626 F.3d 842, 849-57 (5th Cir. 2010) (panel rehearing). We held that this dismissal order could not be read as having reached the merits of the federal claim, but rather must be viewed as resting on independent and adequate state law grounds for purposes of procedural default. *Id.* Accordingly, we agree with the district court that Trevino's claim for ineffective assistance of counsel, which the Texas Court of Criminal Appeals

No. 10-70004

dismissed on abuse-of-writ grounds under Section 5 of Article 11.071 of the Texas Code of Criminal Procedure, was dismissed on independent and adequate state grounds and is, thus, procedurally defaulted. Reasonable jurists cannot disagree with the district court's procedural ruling in this regard. We, therefore, affirm the district court's denial of COA for this claim.[10]

## D.

We also affirm the district court's denial of COA regarding Trevino's claim that the factors in Texas's capital sentencing scheme—such as "future dangerousness"—are vaguely defined and fail to properly channel the jury's discretion. As the district court correctly held, we have repeatedly rejected similar arguments. *See, e.g., Leal v. Dretke*, 428 F.3d 543, 553 (5th Cir. 2005) (citing numerous cases rejecting vagueness challenges to the terms of Texas's capital sentencing scheme). Because jurists of reason cannot debate that the district court correctly held that this claim has no merit under binding precedent, we affirm the district court's denial of a COA.

## E.

Finally, we affirm the district court's denial of a COA regarding Trevino's argument that Texas procedure unconstitutionally prevented the trial court from informing the jury of the effect of a hung jury during Trevino's sentencing. The district court noted first that Trevino raised this same claim during his direct appeal in state court and during his first state habeas proceeding; the Texas courts rejected the claim. The district court also correctly explained that the Supreme Court and this court have rejected similar claims numerous times. *See Jones v. United States,* 527 U.S. 373, 382, 119 S. Ct. 2090, 2098 (1999) (holding

---

[10] The district court granted COA on the issue of whether Trevino could meet the "fundamental miscarriage of justice" exception to the procedural default of his ineffective-assistance claim, and we will address that issue separately below.

No. 10-70004

that the Eighth Amendment does not require a capital sentencing jury to be instructed regarding the effect of a "breakdown in the deliberative process").[11] Reasonable jurists cannot debate the district court's disposition of this issue. Thus, we affirm the district court's denial of a COA on this ground.

## IV.

We next consider the three claims on which the district court granted COA.

## A.

The district court granted COA on Trevino's *Brady* claim regarding the prosecution's alleged suppression of Rey's second written statement during the punishment phase of his trial. Trevino argues that had the prosecution disclosed Rey's second written statement, it is reasonably probable that the jury would not have sentenced him to death. For substantially the same reasons that we reject this claim with regard to the guilt/innocence phase of trial, we hold that the government's alleged suppression of Rey's second written statement was not material to the punishment phase of Rey's trial under *Brady*.

Admission of Rey's written statements at the sentencing phase of trial would not have tended to prove that Trevino lacked culpability in the stabbing death of Salinas. As explained, Rey contradicted all of the salient facts of his second written statement in the third written statement he made to the police after his arrest. Subsequently, Rey pleaded guilty to Salinas's murder, stipulating to the truth of his third statement. Whatever probative value the second written statement may have had, therefore, was negated by Rey's third

---

[11] *See also Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2007) (recognizing that precedent precludes any argument that the Eighth Amendment or the Due Process clause of the Fourteenth Amendment requires a Texas capital sentencing jury to be informed of the effect of failure to reach a unanimous verdict).

No. 10-70004

statement and, later, by his guilty plea.  As such, a reasonable jury could not have given Rey's second statement any credence during sentencing.

Accordingly, Rey's second written statement was not material to Trevino's sentence because there is no "reasonable probability" that the prosecution's disclosure of the statement would have changed the outcome of the sentencing phase of Trevino's trial.

## B.

The district court granted COA regarding Trevino's claim that he received ineffective assistance of counsel based on his trial attorneys' failure to discover and present Rey's second written statement during the sentencing phase of trial. Trevino argues that such failure meets the standard for prejudice established by the Supreme Court.  *See Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.  This claim has no merit for the reasons stated above.  The record evidence clearly shows that Rey's second statement had no materiality and that, accordingly, Trevino's attorneys' alleged failure to seek out the full statement and attempt to present it to the jury did not prejudice Trevino's interests during sentencing under the meaning of *Strickland*.

## C.

Finally, the district court granted COA regarding Trevino's claim that it would be a "fundamental miscarriage of justice" if Trevino were not permitted to pursue his claim that his trial counsel failed to investigate and present compelling mitigating evidence at the sentencing phase of trial.  As explained above, we agree with the district court that Trevino's ineffective-assistance claim regarding his counsel's alleged failure to discover and use "new," potentially mitigating evidence is procedurally barred under Texas's abuse-of-writ doctrine. Thus, the only issue on which the district court granted COA is whether Trevino's claim qualifies for the narrow exception to the prohibition on habeas review of procedurally barred claims when there exists a "fundamental

No. 10-70004

miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749-50, 111 S. Ct. 2546, 2564-65 (1991).

To satisfy the "miscarriage of justice" test, a petitioner must supplement his constitutional claim with a colorable showing of "actual innocence." *Sawyer v. Whitley*, 505 U.S. 333, 335-36, 112 S. Ct. 2514, 2519 (1992).  In the context of the sentencing phase of a capital murder trial, the Supreme Court has held that a showing of actual innocence is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner *eligible* for the death penalty under applicable law.  *Id.* at 346-48, 112 S. Ct. at 2523.  This "actual innocence" inquiry, thus, must be carefully focused on mitigating evidence related to the legal factors that render a capital defendant eligible for a death sentence.  *Rocha v. Thaler*, 619 F.3d 387, 405 (5th Cir. 2010).  We recently explained this actual-innocence inquiry at length:

> When a claim of actual innocence contests a sentence of death, the habeas petitioner's claim must tend to negate not just the jury's discretion to impose a death sentence but the petitioner's very eligibility for that punishment. That is, a habeas petitioner who is unquestionably eligible for the sentence received can never be actually innocent of the death penalty.  This is so because late-arriving constitutional error that impacted only a jury's sentencing discretion is not sufficiently fundamental as to excuse the failure to raise it timely in prior state and federal proceedings. The actual innocence requirement must, then, focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error.

*Id.* at 405 (internal quotations and citations omitted).  Thus, if a defendant is eligible for the death penalty, the actual-innocence inquiry does not take into account the entire universe of potential mitigating evidence that a defendant

may seek to present that could have affected a jury's discretion to impose the death penalty. *Id.*[12]

The "new" mitigating evidence on which Trevino relies relates primarily to his difficult, abusive childhood and his struggles with alcohol and illegal substances.[13] The subject matter of this evidence is somewhat cumulative of the testimony of Trevino's aunt, who testified that Trevino had experienced difficulties involving the absence of his father and his mother's alcohol problems. But the volume of new evidence identified by Trevino is much greater than what was presented by his trial attorneys. Notwithstanding the volume of this potentially mitigating evidence or the effect it might have had on the jury's sympathies, this evidence does not satisfy the demanding standard of "actual innocence" because it bears no relationship to Trevino's eligibility for the death penalty.

---

[12] *See also Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008) ("The 'actual innocence' requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of claim of constitutional error.").

[13] As described by the district court, this "new" mitigating evidence can be summarized as follows:

> (1) the petitioner's mother was an emotionally unstable, physically abusive alcoholic who abused alcohol throughout her pregnancy with petitioner; (2) petitioner weighed only four pounds at birth and required considerable hospital care during his first few weeks of life; (3) for the rest of his life, petitioner suffered from the deleterious effects of Fetal Alcohol Syndrome, as well as his mother's physical and emotional abuse; (4) petitioner suffered numerous serious head injuries as a child for which he received little or no medical care due to the neglect of his mother and the absence of his father; (5) petitioner was exposed to alcohol and drug abuse from an early age and began abusing both alcohol and marijuana himself before he reached age twelve; (6) petitioner became involved in street gangs and street crime by age twelve; (7) petitioner experienced a lifetime of adversity, disadvantage, and disability; (8) petitioner attended school irregularly and performed poorly in school; and (9) petitioner suffers from impaired cognitive abilities.

*Trevino*, 678 F. Supp. 2d at 467.

No. 10-70004

The evidence presented during the guilt/innocence phase of trial, combined with the evidence presented during the sentencing phase, rendered Trevino legally eligible for the death penalty.  Trevino became eligible for the death penalty during the sentencing phase on the jury's affirmative answer to the special question asking whether Trevino represented a continuing threat to society.  *See* TEX. CODE CRIM. P. ART. 37.071 § 2(b) (2011).[14]  The potential mitigating evidence Trevino discusses would have had no appreciable effect on the jury's decision regarding this future dangerousness question.

Ample evidence was presented during the guilt/innocence phase of trial entitling the jury to determine that Trevino represented a continuing threat to society.  Much of the testimony arrayed against Trevino indicated future dangerousness, including Gonzales's testimony that Trevino made callous, menacing comments following Salinas's murder such as "I learned how to use a knife" and "I learned how to kill in prison."  The prosecution also presented additional evidence regarding Trevino's future dangerousness such as Trevino's past convictions for various crimes, including unlawful possession of a handgun; his membership in a notorious street gang; and tattoos indicating that he closely identified himself with this gang.

None of the new mitigating evidence Trevino discusses—which relates primarily to the circumstances of his childhood—would have been relevant to the jury's consideration of Trevino's future threat to society.  As the district court pointed out, if anything, this type of mitigating evidence is "double-edged," in that it could just as easily be interpreted to support the conclusion that Trevino

---

[14] A criminal defendant's eligibility for the death penalty requires the jury to "convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase." *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S. Ct. 26300, 2634-35 (1994) (internal citation omitted).

No. 10-70004

represents a future danger as it could be interpreted to undermine such a conclusion.

Furthermore, Trevino's argument that this new mitigating evidence would have rendered him ineligible for the death penalty pursuant to the jury's second special question at the sentencing phase is without merit. In Texas's capital sentencing scheme, the second special question permits the jury to make an individualized determination of the defendant's moral culpability by considering the circumstances of his offense as well as his character and background. *See* TEX. CODE CRIM. P. ART. 37.071 § 2(e)-(f) (2011). This question implicates the jury's discretion to impose the death penalty and, thus, is viewed as a "selection" issue rather than an "eligibility" issue in the parlance of the Supreme Court's death-penalty jurisprudence. *See Tuilaepa*, 512 U.S. at 971-73, 114 S. Ct. at 2634-35. As with other "actual innocence" claims that we have rejected, Trevino's argument simply "reduces to an assertion that mitigating evidence could have influenced the jury's discretion in considering a sentence of death; he does not argue that this evidence would have rendered him ineligible for the death penalty." *Rocha*, 619 F.3d at 405.[15]

Accordingly, Trevino fails to satisfy the actual-innocence standard. The "fundamental miscarriage of justice" exception to the prohibition against habeas review of procedurally barred claims, therefore, does not apply to Trevino's claim regarding ineffective assistance of counsel.

V.

For the foregoing reasons, we conclude that a COA is not warranted for any of the five issues that Trevino has raised on this petition; moreover, the

---

[15] *See also Haynes*, 526 F.3d at 195 ("The evidence that was allegedly not presented during Haynes's sentencing deals exclusively with mitigating evidence and this evidence does not show that Haynes was actually innocent of a death-eligible offense.").

district court correctly denied relief on the three claims on which the district court granted COA. Accordingly, we AFFIRM the district court's order denying habeas relief to Trevino.

No. 10-70004

DENNIS, Circuit Judge, dissenting.

Sam Rey, an accomplice to the rape and murder of Linda Salinas on June 9, 1996, gave a detailed, sworn, written statement to police on June 12, 1996, which completely exculpated Carlos Trevino. This statement by Rey contradicted the testimony of Juan Gonzales, the state's chief prosecution witness, who said that Trevino participated in the rape and shortly after the crime, Trevino made statements to Rey, Gonzales, and others inculpating himself in Salinas' murder. In his federal habeas petition, Trevino contends that the state failed to disclose Rey's June 12th written statement in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and that if the statement had been disclosed and available, his attorneys failed to discover and use it, rendering their assistance ineffective in violation of *Strickland v. Washington*, 466 U.S. 668 (1984). The majority concludes that Trevino is not entitled to habeas relief because Rey's June 12th statement is not "material" under *Brady* and *Strickland*. The majority reasons that Rey's statement is not material because the prosecutor in Trevino's trial would have used a subsequent, June 13th, written statement by Rey, which inculpated Trevino, to contradict Rey's earlier June 12th statement. However, that later statement does not appear anywhere in the record before the district court in this case; indeed, the majority has produced it *sua sponte* by going outside of the record in this case, to a record of another state court case to which Trevino was not a party. Neither the state nor Trevino had ever before mentioned Rey's June 13th statement, let alone litigated the significance of it—for all we know, neither Trevino nor the state's attorneys in Trevino's criminal trial, nor the state's attorneys in Trevino's habeas proceedings, has ever seen or heard of this statement before the majority *sua sponte* obtained a copy of it after this appeal was fully briefed.

I respectfully disagree with the majority's course in taking judicial notice of Rey's June 13th written statement and using it to resolve this case on its

No. 10-70004

merits. The majority provides no authority that permits us, without request or agreement of the parties, to go outside of the record before the district court, to a state court record of a different case, of a different defendant, to find a statement by a non-party witness who did not testify at the petitioner's trial. Moreover, the majority makes a determination that Rey's June 13th statement is more truthful than his June 12th statement, and therefore is a retraction of it; however, such a credibility determination is not a kind of fact that may be judicially noticed, *viz.*, a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Rather than using judicial notice to improperly supersede Rey's June 12th statement with his June 13th statement that was not part of the district court's record, we should vacate the district court's judgment and remand the case for an evidentiary hearing or stipulations of the parties as to the context and circumstances surrounding Rey's June 12th and 13th statements and for decisions upon the issues arising out of them. I do not share the majority's confidence in their ability as appellate judges with nothing but a paper record to neatly reconstruct the likely outcome of this case had all of Rey's statements been disclosed to defense counsel before trial, since Rey's third statement, upon which the majority so heavily relies in affirming the death penalty, has never been introduced or subjected to any trial court adversary proceedings in this case. Accordingly, I respectfully dissent.

## I.

Carlos Trevino was convicted by a Texas jury of the June 9, 1996, sexual assault and murder of Linda Salinas in San Antonio, and sentenced to death. The state's case at the guilt-innocence phase of Trevino's trial hinged on the testimony of Juan Gonzales. He testified that Trevino and three other young

men, Santos Cervantes, Sienido (Sam) Rey, and Bryan Apolinar picked up Salinas at a gas station and drove her to Espada Park where they sexually assaulted her; that Cervantes alone had lured Salinas into the car; that Gonzales had seen Cervantes with a knife before Salinas' murder and Cervantes told Gonzales that he had disposed of the knife after Salinas' murder; that Gonzales heard Cervantes say something about a knife in the car after Salinas was killed; and that Gonzales believed Cervantes killed Salinas.  Gonzales also testified that after the sexual assault, he heard Cervantes and Apolinar say, "we don't need no witnesses," and Trevino say, "we'll do what we have to do"; that he left before Salinas was stabbed, but shortly afterwards, he saw blood on Trevino and Cervantes; and that as the five men drove away from the park, Cervantes said it was "cool" or "neat" how Trevino had "snapped" Salinas' neck, and Trevino responded that he had "learned how to kill in prison."  The prosecutor relied heavily on Gonzales' testimony about Trevino's statement in the car to argue to the jury that Trevino was the actual killer.  At the sentencing phase of the trial, the state again rested its case heavily on Gonzales' testimony that after Salinas' murder Trevino said that he had "learned how to kill in prison."

On March 25, 1998—nearly nine months after Trevino's conviction—Rey pleaded guilty to murder and received a fifty-year sentence.[1]  On May 5, 1998, Cervantes pleaded guilty to capital murder and received a life sentence.[2]  Apolinar went to trial and was convicted of aggravated sexual assault.[3]

---

[1] *See State v. Rey*, No. 97-CR-1717C (290th Dist. Ct., Bexar Cnty., Tex. Mar. 25, 1998) (criminal docket sheet entry); *see also* Tex. Pen. Code § 19.02.

[2] *See State v. Cervantes*, No. 97-CR-1717B (290th Dist. Ct., Bexar Cnty., Tex. May 5, 1998) (criminal docket sheet entry); *see also* Texas Pen. Code § 12.31 ("An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for . . . life without parole.").

[3] *See Apolinar v. State*, No. 04-99-00644-CR, 2000 WL 1210922 (Tex. Crim. App. Aug. 16, 2000) (unpublished); *see also* Tex. Pen. Code § 19.03.

No. 10-70004

Gonzales, the only one of the group who testified against Trevino, was not charged.

During his federal habeas proceedings, Trevino's counsel uncovered a sworn, written statement that Sam Rey gave to Detective Barry Gresham, the lead detective investigating Salinas' murder, on June 12, 1996, three days after Salinas was killed. That statement, which is attached to Trevino's federal habeas petition, reads in its entirety[4]:

> My name is Seanido Rey I was born on 07-29-75. I am 20 years old. I live at 1131 San Fernando with my sister the phone number is 226-0391.
>
> I have already given Det. Gresham a statement, but I would now like to tell the truth of what really happened on last Sunday night.
>
> Everything I said was true about what happened up to the part when we were at the Pic Nic. While we were there I saw a girl talking on the telephone. Santos was talking to her. Det. Gresham showed me a picture of a girl and this was the same girl I saw on the telephone. I signed and dated this photograph. When I went to the car the girl Det. Gresham told me was named Linda came also she was with Santos. We all got in the car with Linda. Linda was in the front right seat sitting in Santo's lap. [Bryan[5]] was driving the car and I was sitting in the back of the car in the middle. Carlos was sitting to the right of me and [Juan[6]] was on my left. When we left the store Linda and Santos was kissing. [Bryan] went to Mission Rd. and went towards Military Hwy. We then went by a park called Espada. Before we got to the park I saw Santos throw a bra to [Bryan] that Linda had taken off. [Bryan] threw the bra out of the

---

[4] The statement is quoted as it appears in the record, including any orthographic irregularities.

[5] Rey referred to the owner of the car as "Jason" in his first statement to Det. Gresham and in this statement. In a later statement he "stated [that] he had been confused about the name of the driver of the car and remembered now the driver's name is Bryan not Jason." In order to avoid confusion, I have changed "Jason" in Rey's quoted statement to "[Bryan]."

[6] In several of the suspects' statements, Juan Gonzales was referred to as "Thatie" or "Tati." *See Trevino v. Thaler*, 678 F. Supp. 2d 445, 460 (W.D. Tex. 2009). Again, to avoid confusion, I have changed "Thatie" in Rey's quoted statement to "[Juan]."

car before we stopped. [Bryan] then parked the car in a parking lot. The whole time we were driving out there Santos and Linda were making out. When we stopped the car Santos and Linda got out. I saw they were holding hands. I knew that he was going to have sex with her. I saw them walking towards the woods. I saw they walked down toward the creek. We all got out and was standing against the car listening to the radio. I never heard any noise coming from the creek. About ten or fifteen minutes later Santos came back from the creek. I think when all this was happening was about 10:30 or so at night but I didn't look at a watch. When Santos comes back up the creek I asked him where the girl was at. He told me "Fuck that bitch, she didn't want to give it up so I stabbed her". I asked him why he did that and I don't remember what he said. Everybody else was close when he said this and I think they heard him also. We then just all get back into the car and leave. We then went to Santo's friends house. On the way everbody was quiet and was not talking about what happened. Santo's friends house is on S. Flores street somewhere but I'm not sure where. When we get to the house Santos tells us to just be quiet about what had happened. I was just in shock about what had happened and didn't say anything. The house is gang house and there was alot of guys and girls there just hanging out. We just drank beer and hung out. We stayed there to about 3:00 in the morning and then [Bryan] took me [Juan] and Carlos back to Carlos's house. [Bryan] and Santos then left they didn't say where they were going. I don't know Santos last name but I have agreed to take you to the house that we picked him up at. This guy named [Bryan] is a friend of [Juan] I don't know his last name or where he lives.

I have read the above statement and It's true and correct.

Also attached to Trevino's federal habeas petition are affidavits from Trevino's two trial attorneys in which they swore that they had never seen this written statement by Rey before Trevino's trial. One of the attorneys swore that Rey's statement "was never produced or shown to us" before Trevino's trial; and the other attorney swore, "I do not recall seeing . . . the June 12, 1996 statement of Seanido Rey prior to 2006, and certainly never saw [it] prior to trial in June 1997."

No. 10-70004

The habeas record in this case also includes a report by Det. Gresham, dated a little more than a month after the crime. The report details Det. Gresham's investigation of Salinas' murder, and includes a summary of three purported statements by Rey. Det. Gresham's summary of Rey's purported first statement says that Rey "read the statement he had given me and signed it," indicating that a separate written statement existed. The summary of Rey's purported second statement provides a brief recapitulation of the sworn, written statement reproduced above, but does not include the rich detail of Rey's written statement. For instance, Det. Gresham's summary leaves out critical facts, such as Rey's statement that "[o]n the way [to Santos' friend's house] ever[y]body was quiet and was not talking about what happened," which contradicts Gonzales' testimony that Trevino had made incriminating statements during that car ride. There is also nothing in Det. Gresham's report that suggests that Rey swore to, and signed a separate, full written statement—as opposed to simply giving Det. Gresham an oral statement. Det. Gresham's summary of Rey's purported third statement contradicts parts of Rey's second statement and includes inculpatory allegations against Trevino. As with Det. Gresham's summary of Rey's purported second statement, the summary of Rey's purported third statement in no way indicates that a separate, written statement existed. Attached to Trevino's federal habeas petition are affidavits from Trevino's trial attorneys in which they swore that they could not remember having seen Det. Gresham's report before Trevino's trial.

Trevino raised two claims for habeas relief based on Rey's second written statement: (1) The state's failure to disclose this statement violated *Brady*; and, (2) if the state did not in fact suppress this statement, Trevino's trial counsel's failure to uncover it and utilize it violated Trevino's right to the effective assistance of counsel under *Strickland*. These two contentions share an overlapping element: materiality of the evidence. *See Brady*, 373 U.S. at 87

32

(suppressed evidence must be "material"); *Strickland*, 466 U.S. at 694 (explaining that a claim of ineffective assistance of counsel requires a showing of "prejudice," and that "the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution"); *see also Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006). In *United States v. Bagley*, the Supreme Court expressly adopted "the *Strickland* formulation of the . . . test for materiality" for *Brady* claims. 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); *see Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009). Therefore, Trevino must make the same showing of the materiality of Rey's second statement for his *Brady* claim and for his *Strickland* claim. That is, Trevino must show that Rey's statement "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

The district court concluded that Trevino failed to show that Rey's statement was material and therefore denied habeas relief for both phases of Trevino's trial without reaching the other component of either the *Brady* or *Strickland* claims—whether the statement was suppressed under *Brady* or whether Trevino's trial counsel's performance was objectively unreasonable under *Strickland*. Therefore, the only issue before us on Trevino's *Brady* and *Strickland* claims is whether Rey's statement is material.

After this appeal was fully briefed, the majority, *sua sponte*, requested the state court record for Rey's murder conviction. That record contains three written statements by Rey, the second of which forms the basis of Trevino's claims in this case, and is the only written statement by Rey that was introduced into the habeas record before the district court. The other two statements do not appear in the district court record in this case and have never been addressed or litigated by the parties. Nonetheless, the majority now reasons that it can take judicial notice of Rey's third (June 13th) statement, and give credit to it in

33

lieu of Rey's second (June 12th) statement.  In my view, that course is not supported by precedent or authority.

## II.

To conclude that Rey's second statement is not material, the majority takes judicial notice of a third written statement by Rey, which the majority has produced *sua sponte* from a state court record for a different case to which Trevino was not a party.  The majority reasons that "[i]f Trevino's lawyers had been successful in introducing Rey's second statement" to question Trevino's guilt, then "the prosecution undoubtedly would have introduced Rey's third statement" to undermine that defense; and, likewise, that if "Rey had attempted to testify at Trevino's trial to the facts contained in his second statement, the prosecution would have undoubtedly impeached Rey with his third statement to the police." Majority Op. 14-15.  The majority's reliance on Rey's third statement is a significant error because (A) the parties have never had an opportunity to litigate the significance or veracity of that statement; (B) the credibility determinations that the majority draws from that statement are not the proper subject of judicial notice; and (C) even assuming *arguendo* that we could take judicial notice of Rey's third statement, it would not necessarily prevent the defense counsel in a hypothetical retrial from effectively using Rey's second statement as tending to exculpate Trevino and challenge the credibility of the state's witnesses against him in the guilt and penalty phases of his capital murder trial.

## A.

The majority *sua sponte* produced Rey's third written statement, without any request or agreement by the parties, from a state court record of a different case to which Trevino was not a party.  It was not part of the record before the district court, as the majority acknowledges, Majority Op. 9 n.3, nor was it ever once mentioned by the parties below or on appeal.  For all we know, neither

No. 10-70004

Trevino nor the state's attorneys in Trevino's criminal trial nor in his habeas proceedings has even seen or been informed of this statement. It certainly stands to reason that if the state's attorneys in Trevino's case had been aware of this statement, as the majority's argument presupposes, then they would have relied upon it in responding to Trevino's habeas petition; but they did not. As such, the parties have never litigated the admissibility or relevance of that statement to Trevino's *Brady* and *Strickland* claims.

## B.

The majority contends that we can *sua sponte* take judicial notice of the statement. Majority Op. 9 n.3. However, that is not allowed by Federal Rule of Evidence 201, which governs judicial notice in the district courts as well as in the courts of appeals. *See* Fed. R. Evid. 201(f) ("Judicial notice may be taken at any stage of the proceeding."); *see also* 21B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5110.1, at 299 (2d ed. 2005) ("Rule 201(f) does not distinguish between taking judicial notice on appeal and appellate review of the trial court judicial notice. . . . [It] places the appellate court under the same limitations as the trial judge whether the appellate court is reviewing trial court notice or noticing facts for the first time."); 1 Jack B. Weinstein, *Weinstein's Federal Evidence* § 201.32 (2011) ("Because Rule 201 authorizes the taking of judicial notice 'at any stage of the proceeding,' judicial notice may be taken by an appellate court. . . . However, appellate courts are still subject to the limitations imposed by Rule 201 on the types of facts that may be judicially noticed and the procedures for noticing them.").

Rule 201 provides, in relevant part:

> **(a) Scope of rule.** This rule governs only judicial notice of adjudicative facts.
> **(b) Kinds of facts.** A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of

No. 10-70004

accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

　**(c) When discretionary.** A court may take judicial notice, whether requested or not.

　**(d) When mandatory.** A court shall take judicial notice if requested by a party and supplied with the necessary information.

　**(e) Opportunity to be heard.** A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of prior notification, the request may be made after judicial notice has been taken.

　**(f) Time of taking notice.** Judicial notice may be taken at any stage of the proceeding.

The majority's taking judicial notice of Rey's third written statement in order to conclude that it retracts and makes immaterial Rey's second statement, is not authorized by law; it judicially notices a kind of adjudicative fact that courts may not take notice of under Federal Rule of Evidence 201. The majority's contention is that the prosecutors would have used Rey's third statement to undermine any beneficial use defense counsel could have made of Rey's second written statement, and thus, that the second statement is immaterial. To reach this conclusion requires the majority to take notice of the following facts: that Rey made a third written statement; that he made it before Trevino's trial; that the prosecutors in Trevino's case were aware of the existence of that written statement at the time of Trevino's trial; that the prosecutors in Trevino's trial would have used that statement if defense counsel had called Rey as a witness or used his second written statement to attack the state's case; and that the jury would have given credit to Rey's third written statement in lieu of his second written statement.

However, these facts are "subject to reasonable dispute" and are not "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Therefore, they are not the "kinds of facts" of which Rule 201 allows a court to take judicial notice. Based on the

36

record before the district court, supplemented by the record from Rey's state court criminal proceeding, we cannot properly know or judicially notice whether the state's attorneys in Trevino's criminal trial were aware of Rey's third statement. (The prosecutor in Rey's case was not the same as in Trevino's case.) It is not at all certain that the state's attorneys would have known of or resorted to using Rey's third statement at trial, because they did not use it or even mention it in Trevino's federal habeas proceedings. Moreover, the majority's argument rests on an improper determination of the relative truthfulness of one statement by Rey vis-à-vis another by him. However, the truth of a statement is not a proper matter for judicial notice. *See* Wright & Graham, *supra*, § 5106.4, at 231-36 ("It seems clear that a court cannot notice pleadings or testimony [in court records] as true simply because these statements are filed with the court. . . . [A] court cannot take judicial notice of the truth of a document simply because someone put it in the court's files . . . . [Courts] can notice [that an] assertion was made, but not that it was true . . . .").

The majority's *sua sponte* course of taking judicial notice here also conflicts with Rule 201's requirement that the parties be heard on the court's taking judicial notice, and it will not prevent another round of litigation regarding Rey's third statement. Instead, as the majority concedes, *see* Majority Op. 9 n.3, it will put the parties in the untenable position of litigating an issue of fact in a petition for rehearing in an appellate court.[7] Rule 201 entitles the parties "upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." Fed. R. Evid. 201(e); *see also id.* advisory

---

[7] The majority offers the following placebo: "[W]e afford [Trevino] the right to raise any objections he may have by means of a petition for rehearing, which objections we will consider filed before our opinion issued." Majority Op. 9 n.3. I fail to understand what effect this has as Trevino unquestionably has the right to raise "each point of law or fact that [he] believes the court has overlooked or misapprehended" in a petition for rehearing. Fed. R. App. P. 40. This does not alleviate, however, the problem of litigating a fact issue for the first time in a petition for rehearing in an appellate court.

committee note (1972) ("Basic considerations of procedural fairness demand an opportunity to be heard on the propriety of taking judicial notice and the tenor of the matter noticed."). This rule applies in the appellate courts as much as it does in the district courts. *See* Wright & Graham, *supra*, § 5110.1, at 299-300 ("[T]he appellate court must follow the procedures in Rule 201(e) in giving the parties an opportunity to be heard."); Weinstein, *supra* ("[A]ppellate courts are still subject to the limitations imposed by Rule 201 on the types of facts that may be judicially noticed and the procedures for noticing them. . . . An appellate court contemplating original judicial notice should notify the parties so that the propriety of taking notice and the tenor of the matter to be noticed can be argued. If oral argument has already been completed, the court should, at a minimum, afford the parties an opportunity to submit supplemental briefs." (footnote omitted) (quoting *Massachusetts v. Westcott*, 431 U.S. 322, 323 n.2 (1977), as saying, "The parties were given an opportunity to comment on the propriety of our taking notice of the license, and both sides agreed that we could properly do so.")). Rule 201 also provides that "[i]n the absence of prior notification, the request may be made after judicial notice has been taken." Fed. R. Evid. 201(e). The majority has not given the parties an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed, and therefore, they will be forced to litigate this issue for the first time in a petition for rehearing.

Finally, the majority's only supporting authorities for taking judicial notice of Rey's third statement are inapposite. The majority cites *Brown v. Lippard*, 350 F. App'x 879 (5th Cir. 2009) (unpublished), but *Brown* is nothing like this case. There, we took judicial notice merely of a "docket entry establishing the existence of the 2001 transcript" of a court proceeding. *Id.* at 882 n.2. Here, the majority takes judicial notice of facts that are subject to reasonable dispute, and are not analogous to the fact that a court docket entry exists. Nor is the

majority's reliance on *Moore v. Estelle*, 526 F.2d 690 (5th Cir. 1976), any more persuasive.  There, we said quite plainly that we will "take judicial notice of *prior habeas proceedings brought by this appellant in connection with the same conviction.*"  *Id.* at 694 (emphasis added).  Of course, Sam Rey's state court criminal proceedings are not "prior habeas proceedings brought by [Carlos Trevino] in connection with [Trevino's] conviction."  *Id.*  Indeed, the majority concedes this point when it describes "our routine practice in *habeas* appeals" as "taking judicial notice of all related proceedings *brought by the appellant*, including state proceedings, even when the prior state case is not made a part of the record on appeal."  Majority Op. 9 n.3 (emphasis added) (internal quotation marks omitted).  Therefore, the majority has provided no relevant authority for its *sua sponte* decision to take judicial notice of facts outside of the record on appeal in this case and contained in a record in a state court proceeding for a different case of a different defendant.

## C.

Assuming *arguendo* that the majority lawfully could take judicial notice of Rey's third statement, the existence of that statement does not prevent defense counsel from arguing that the state's suppression of Rey's second written statement casts a different light on Trevino's capital murder trials so as to undermine confidence in those proceedings. Rey's third written statement shows that Rey was not even present when Salinas was killed and, therefore, could not credibly say who stabbed Salinas.  Nor it does it contradict the portion of Rey's second statement in which he said that nobody, including Trevino, said anything in the car following Salinas' murder.  *See* Majority Op. 7-8 (quoting Rey's third written statement).    Therefore, Rey's second statement would stand unchallenged in contradicting the critical aspect of Gonzales' testimony that in the car after Salinas' murder, Cervantes said it was "cool" or "neat" how Trevino

39

No. 10-70004

had "snapped" Salinas' neck, and that Trevino responded that he had "learned how to kill in prison."

## III.

For these reasons, the fair and proper course would be for the majority to vacate the judgment and remand this case to the district court to consider all of Rey's statements and any additional evidence relevant thereto, and to determine whether all of that evidence undermines confidence in Trevino's capital murder guilt and penalty trials. It is clear that on the record before the district court, Rey's second statement is material—otherwise, the majority would not have found it necessary to commit serious legal error by *sua sponte* going outside of the district court's record to take notice of facts not judicially noticeable under Federal Rule of Evidence 201 in order to reach the contrary conclusion. Moreover, as I explain *infra* in Part IV.A, Trevino's trial attorneys could have put Rey's second statement to good use to cast doubt on his guilt, and the record before us is insufficiently developed for us to decide whether Rey's third statement actually would have eviscerated defense counsel's every use of Rey's second statement in Trevino's guilt and death penalty trials. Therefore, in my view, it is necessary to remand this case because now that Rey's third statement has been produced, the parties should be allowed an opportunity to litigate the significance of that statement, specifically, whether it undermines the materiality of Rey's second statement, and the district court should reconsider this case in light of those arguments and all of the available relevant evidence.

When the Eleventh Circuit was confronted with a similar situation—i.e., whether to consider extrarecord evidence that may have been significant in resolving the habeas petitioner's claim—that court remanded to the district court to first find the necessary facts. *See Ross v. Kemp*, 785 F.2d 1467, 1477 (11th Cir. 1986). In contrast, the majority simply assumes the facts that it thinks the district court would have found after a full and fair hearing, providing

40

no authority for its course of action, and plainly stepping beyond the bounds of its limited authority to judicially notice certain kinds of facts under Federal Rule of Evidence 201. The majority's course is unfair for the resolution of a highly controversial issue based on uncertain evidence from murky and questionable, self-interested recollections of death penalty defendants. I would instead follow the course taken by the Eleventh Circuit and remand this case to the district court to allow the parties to litigate the issues given rise to by the state's apparent suppression of Rey's second and third statements.

## IV.

In concluding that Rey's second statement was not material the majority also errs, in my view, by (A) reasoning that Rey's second statement "would likely have been inadmissible," and ignoring the substantial use that Trevino's trial attorneys could have made of that statement even without admitting it into evidence; (B) purporting to make a factual finding that the state did not suppress Rey's statement, a finding which is the subject of a factual dispute that the district court expressly left unresolved; (C) concluding that Rey's statement was not material because "the evidence presented at Trevino's trial supports the jury's verdict of conviction under Texas's law of the parties." Majority Op. 14-17.

## A.

The majority mistakenly asserts that "Rey's [second] written statement would likely have been inadmissible." Majority Op. 14 n.7. This is perplexing considering that the majority expressly acknowledges that "inadmissible evidence may be material under *Brady*." *Spence v. Johnson*, 80 F.3d 989, 1005 n.14 (5th Cir. 1996) (citing *Sellers v. Estelle*, 651 F.2d 1074, 1077 n.6 (5th Cir. 1981)); *see* Majority Op. 14 n.7 (citing *Felder v. Johnson*, 180 F.3d 206, 212 (5th Cir. 1999)). Indeed, this court has often "reaffirm[ed] that 'inadmissible evidence may be material under *Brady*.' Thus, we ask only the general question whether the disclosure of the evidence would have created a reasonable probability that

the result of the proceeding would have been different." *Felder*, 180 F.3d at 212 (citations omitted) (quoting *Spence*, 80 F.3d at 1005 n.14); *see also United States v. Brown*, 650 F.3d 581, 2011 WL 3524412, at *5 & n.12 (5th Cir. 2011) ("The suppressed evidence need not be admissible to be material under *Brady*; but it must, somehow, create a reasonable probability that the result of the proceeding would be different." (citing *Felder*, 180 F.3d at 212)); *Spence*, 80 F.3d at 998, 1005 n.14 (same); *Sellers*, 651 F.2d at 1077 n.6 (same); *Martinez v. Wainwright*, 621 F.2d 184, 188 (5th Cir. 1980) (holding that evidence was material even if it "were held to be hearsay and not admissible" because "it at least would have provided the defense the ability to contact the appropriate" people to gather the evidence in admissible form). Moreover, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the majority of the Supreme Court squarely rejected Justice Scalia's dissenting view that because undiscovered mitigation evidence was likely inadmissible under state law during the punishment phase of a capital murder trial, it was not material under *Strickland*. *See* 539 U.S. at 536; *id.* at 554-57 (Scalia, J., dissenting). Writing for seven members of the Court, Justice O'Connor explained, "had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence. *In reaching this conclusion*[]"—that the evidence was material under *Strickland*—"*we need not, as the dissent suggests, make the state-law evidentiary findings that would have been at issue at sentencing.*" *Id.* at 536 (majority opinion) (emphasis added) (citation omitted).

In *Sellers*, under extremely similar circumstances as this case, we also rejected the contention that evidence must be admissible to be material under the *Brady-Strickland* standard. 651 F.2d at 1077 n.6. There, the suppressed police reports included a written statement of a friend of Santos Cantera, which alleged that Cantera had told him that Cantera was the actual killer. *Id.* at 1075-77. The lower court held that the evidence was immaterial in part because

this statement was inadmissible. *Id.* at 1076, 1077 n.6. We held that "[s]uch a conclusion [was] unwarranted," and explained why the written statement of Cantera's friend, although apparently inadmissible, was still material: "First, by enabling the defense to examine [the suppressed evidence], Sellers may have been able to produce witnesses whose testimony or written statements may have been admissible. *Martinez v. Wainwright*, 621 F.2d 184 (5th Cir. 1980). Second, the evidence . . . suppressed was material to the preparation of [Sellers] defense, regardless of whether it was intended to be admitted into evidence or not." *Sellers*, 651 F.2d at 1077 n.6; *see also Spence*, 80 F.3d at 998 ("The district court concluded that the undisclosed evidence was not material because under Texas law it would not have been admissible at trial. The Fifth Circuit has expressly found otherwise in *Sellers v. Estelle*," 651 F.2d 1074 (5th Cir. 1981).).

For substantially similar reasons, Rey's second statement would have been extremely useful to Trevino's trial attorneys regardless of whether it was admissible. First, Rey's second statement may have led Trevino's counsel to call Rey to testify in contradiction to Gonzales' testimony, particularly his testimony about the statements Trevino allegedly made in the car after Salinas was killed. *See Kyles*, 514 U.S. at 445-46 (discussing the possibility of defense counsel calling "as an adverse witness" an alternative suspect whose statements had been suppressed); *Sellers*, 651 F.2d at 1077 n.6; *Martinez*, 621 F.2d at 188 ("If the [suppressed] rap sheet were held to be hearsay and not admissible to prove the [state's witness's] prior convictions, it at least would have provided the defense the ability to contact the appropriate penal facilities to acquire an official record which would have been admissible."). This, in fact, is exactly what Trevino's trial counsel swore that he would have done with Rey's written statement: "I would have definitely used it . . . to further discredit Juan Gonzales . . . ." Thus, the majority is simply mistaken that "[n]othing in the record remotely suggests that disclosure of the full text of Rey's second statement would

have changed th[e] strategic calculation made by Trevino's attorneys." Majority Op. 17. The majority's only reason for why this does not make Rey's second statement material is based on its mistaken reliance on Rey's third statement.[8]

Second, Rey's second statement was important to the preparation of Trevino's defense, regardless of whether it was intended to be admitted into evidence or not. *See Sellers*, 651 F.2d at 1077 n.6. As the Court explained in *Kyles*, competent counsel "could have examined [Det. Gresham] to good effect on [his] knowledge of [Rey's out-of-court] statement[] and so have attacked the reliability of the investigation." 514 U.S. at 446.[9] That is, competent counsel could have used Rey's second statement to cast particular aspersion on Cervantes as the only person culpable for Salinas' murder, and to show that Det. Gresham's investigation focused on Trevino, despite Rey's statement exculpating Trevino; and that Det. Gresham never pursued a more rigorous investigation of Cervantes, despite Rey's statement that inculpated only Cervantes. Again, Trevino's trial counsel swore he would have used Rey's statement for this exact purpose, "in the cross-examination of [D]etective

---

[8] The majority concludes that "[i]n the extremely unlikely event that Rey had attempted to testify at Trevino's trial to the facts contained in his second statement, the prosecution would have undoubtedly impeached Rey with his third statement," Majority Op. 15; by which the majority seems to mean that in their view, the jury would have certainly believed the contents of Rey's third statement and not his live testimony to the contrary. However, as I explained in Part II.B, this credibility determination is based on taking judicial notice of Rey's third statement, and such a credibility determination is not a kind of fact that may be judicially noticed. *See* Fed. R. Evid. 201(b) (Providing for judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

[9] There would be no hearsay problem in using Rey's statement to attack the credibility of Det. Gresham's investigation since "'[h]earsay' is a statement . . . offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). Rey's statement would not have been offered into evidence, and it would not have been used to prove the truth of the matter asserted in the statement, but to show that Det. Gresham's investigation was unreliable because it was not thorough, impartial and objective.

Gresham to show the jury that Santos Cervantes and not . . . Trevino[] stabbed and killed [Salinas]"; which again contradicts the majority's assertion that "[n]othing in the record remotely suggests that disclosure of the full text of Rey's second statement would have changed th[e] strategic calculation made by Trevino's attorneys." Majority Op. 17. The majority does not address the impact that undermining the investigation would have had on the jury's assessment of the evidence.

"In any event, contrary to the [majority's] assertion, it appears that [Rey's second statement] may have been admissible under [Texas] law." *Wiggins*, 539 U.S. at 536. If Det. Gresham had used Rey's second statement to refresh his memory before testifying at Trevino's trial then Trevino would have been "entitled . . . to introduce in evidence those portions which relate to the testimony of the witness." Tex. R. Evid. 612. Of course, Trevino's attorneys were unable to ask Det. Gresham whether he had used Rey's second written statement to refresh his memory because they were unaware of its existence. Therefore, the majority is mistaken that Rey's second statement was inadmissible.

## B.

The majority also mistakenly contends that "the record evidence strongly indicates that the prosecution did not suppress [Rey's second] statement." Majority Op. 14. However, as the majority admits, whether the state suppressed the statement turns on a factual dispute that the district court did not resolve. Majority Op. 14 n.6.[10] Also, the majority fails to appreciate that in addition to

---

[10] *See Trevino*, 678 F. Supp. 2d at 459-60 ("There are many unresolved factual disputes before this Court concerning precisely what documentation was made available to [Trevino's] trial counsel by the prosecution before and during [Trevino's] capital murder trial. More specifically, there appears to be a genuine issue of material fact regarding whether . . . Rey's statement, which indicated Cervantes admitted to Rey that he stabbed Salinas, was ever made available to [Trevino's] trial counsel. It is unnecessary to resolve these disputes because, having reviewed the evidence from both phases of [Trevino's] trial, this Court concludes Rey's

a *Brady* claim, Trevino has raised a *Strickland* claim based on Rey's second statement, *viz.*, if the statement was not suppressed, then his attorneys were constitutionally ineffective in failing to discover the statement. Therefore, even *if* Rey's second statement was not suppressed, there still exists another unresolved factual question of whether Trevino's attorneys' failure to discover the statement rendered their performance constitutionally deficient.

Moreover, in resolving this factual dispute, the majority seriously errs in its assessment of the evidence regarding the state's suppression of Rey's second statement: (1) The majority ignores the record evidence that Trevino's trial attorneys swore in affidavits that Rey's second statement "was never produced or shown to us" before Trevino's trial, and that, "I . . . certainly never saw [Rey's statement] prior to trial in June 1997." (2) The majority is mistaken that Det. Gresham's report "should have put defense counsel on notice that Rey had made [a] statement to police to police suggesting that Cervantes stabbed the victim" and that "[t]he onus was then on Trevino's lawyers to request a copy of the full statement." Majority Op. 14. Nothing in Det. Gresham's report suggests that there was a separate, written and signed statement by Rey exculpating Trevino. If anything, Det. Gresham's report suggests just the opposite: Det. Gresham's report includes a summary of Rey's first statement, and notes that Rey "signed the statement." (R. at 385). However, there is no such indication in the report that Rey signed his *second* statement, the statement that is at the heart of this appeal. Nothing in Det. Gresham's report should have alerted Trevino's attorney to the existence of a second, written statement. (3) The state does not even contend that it disclosed Rey's second statement. *See* Resp't Br. 26 (Rey's second "statement itself may not have been in the State's file

---

statement does not satisfy the 'materiality' prong for purposes of *Brady* analysis."); *see also id.* at 466-67 (addressing only the prejudice prong of Trevino's *Strickland* claim).

. . . ."). In sum, if anything, the record evidence indicates that the prosecution suppressed Rey's second statement.

## C.

Finally, the majority errs by concluding that Rey's second statement was not material because "the evidence presented at Trevino's trial supports the jury's verdict of conviction under Texas's law of the parties." Majority Op. 16.[11] The majority reasons that "Rey's written statements cast no doubt on the substantial, uncontroverted evidence presented during the guilt/innocence phase of the trial supporting the conclusion that Trevino acted with intent to commit the offense and aided or attempted to aid other members of the group in commission of Salinas's murder." Majority Op. 16. This is clearly incorrect. Rey's second statement fully exculpates Trevino of any involvement in the rape and murder of Salinas, and thus absolves Trevino of criminal responsibility for her killing, even under Texas' law of the parties. Moreover, Rey's second statement casts doubt on Gonzales' crucial testimony that Trevino made incriminating statements after Salinas' murder, which would have been significant for the jury's determination of whether Trevino was guilty under Texas' law of the parties, that is, whether he "intended to kill [Salinas] or anticipated that a human life would be taken."

This case is distinguishable from *Miller v. Dretke*, 404 F.3d 908 (5th Cir. 2005), another case charged under Texas' law of the parties cited by the majority. Majority Op. 16. In *Miller*, there was "uncontroverted, overwhelming evidence of [the defendant's] involvement in th[e] conspiracy [to commit a robbery] and the nature of the robbery" and the alleged *Brady* evidence merely suggested that the other participant in the robbery, and not the defendant, actually shot the victims. 404 F.3d at 916. Here, by contrast, there was

---

[11] Texas' law of the parties doctrine is codified in Texas Penal Code § 7.02.

disputed and weak circumstantial evidence that Trevino participated in the assault on Salinas, and the *Brady* evidence indicates that Trevino did not participate in *any* aspect of the crime, not just that someone other than Trevino committed the murder. Therefore, even under Texas' law of the parties, Rey's second statement would have been critical to defense counsel to cast doubt on Trevino's culpability.

## V.

In my view, the majority has fallen into error by taking judicial notice of Rey's third statement and unproven facts related to that statement; and improperly assessing the credibility and weight of those statements, without their surrounding facts and circumstances, and other evidence in this case, in order to render judgment in favor of the state. Now that Rey's third statement has been produced, I would remand this case to the district court to allow the parties an opportunity to litigate the significance of that statement, and consider all of Rey's statements and additional evidence relevant thereto to determine whether all of that evidence undermines confidence in Trevino's capital murder trials. For these reasons, I respectfully dissent.